## Case No. 5,512.

### GOLD HILL v. CALEDONIA SILVER MIN. CO.

### [5 Sawy. 575.] [1]

Circuit Court, D. Nevada. Aug. 25, 1879.

TAXATION OF MINES—MUNICIPAL CORPORATION.

1. In article 10 of the constitution of Nevada the words "mines and mining claims" do not include the surface improvements on a mining claim. Such improvements are subject to taxation.

2. It being conceded that the legislature has power to establish a municipal corporation and to confer on it a portion of the legislative power, including a power of taxation, this court will not enter upon an inquiry as to whether the defendant, who is taxed by it, is benefited or not by being included within the corporate limits, with a view to determining the validity of the tax. That inquiry is properly a legislative and not a judicial one.

The agreed statement of facts and the evidence together, show that the plaintiff is a municipal corporation, and the defendant a mining corporation, having a mining claim within the corporate limits; that upon this claim there are hoisting works and machinery affixed to the soil; that there is also personal property about the mine used in working it; that a tax for municipal purposes was levied upon the town lots which embrace the surface of defendants' mining claim, upon the improvements and the personal property. This suit is brought to inforce the payment of the tax so levied.

John Harris and Lewis & Deal, for plaintiff.

Stone & Hiles, for defendant.

Before SAWYER, Circuit Judge, and HILLYER, District Judge.

HILLYER, District Judge. The defendant resists the payment of the tax levied upon it by the plaintiff on two grounds. Firstly, because the tax is in violation of article ten of the constitution of the state of Nevada, which restricts the power of taxation to the "proceeds alone" of "mines and mining claims." The defendant contends that this article forbids not only the taxation of the body of the mine itself, but also the permanent engines and machinery affixed to the soil, which, it is said, are included in the words "mines and mining claims." It is also claimed that the tax on the personal property used in carrying on the work of the

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

mine is essentially a tax on the mining claim. Whether or not this objection to the tax is well taken depends upon the true sense the words "mines and mining claims" were intended to have as used in the constitution. So far as the personal property, not fixed to the soil, is concerned, there seems to be no reasonable ground for exempting it from taxation as included either in the term mine or mining claim.

The hoisting works, with its machinery, is much more plausibly claimed to be fairly included in the term "mines and mining claims." But even as to them there are satisfactory reasons showing that the framers of the constitution did not intend to exempt the hoisting works and machinery, and generally the surface improvements of a mine from taxation. It cannot of course be denied that under many circumstances the words "mine and mining claim" include both the mine proper beneath the surface and the works above on the surface; but here the question is, under all the circumstances, in what sense did the framers of the constitution use these words? No presumptions are to be made in favor of exemptions from taxation; on the contrary, all the presumptions are against them. Memphis & C. R. Co. v. Gaines, 97 U. S. 697. If the words to be construed will fairly bear a construction narrower than the one claimed by the defendant, we must presume the legislature or framers of the constitution used them in the more restricted sense, inclining to that construction which will trench as little as possible on the state's power of taxation, a power vital to its existence. In the case of Platt v. Union Pac. R. Co., 99 U. S. 48, the supreme court of the United States lays down a rule of construction which can be applied with profit in this case. "There is," says the court, "always a tendency to construe statutes in the light in which they appear when the construction is given. * * * But in endeavoring to ascertain what the congress of 1862 intended, we must, so far as possible, place ourselves in the light that congress enjoyed, look at things as they appeared to it, and discover its purpose from the language used in connection with the attending circumstances."

From before the organization of the territory of Nevada down to the adoption of the present constitution this was essentially a country of mines and mining claims, and the exemption of mining property to the extent claimed by the defendant would have made it impracticable, probably, to establish a state government. We find from the beginning a distinction taken and kept up in the revenue laws, between the mine or mining claim and the surface improvements. In 1861 "mining claims" were exempted from taxation, while the machinery and improvements on the claim were taxed. Laws 1861, p. 146. See, also, Laws 1862, p. 132; Laws 1864, p. 38. These laws all keep up the distinction between mines and improvements on them, classing the former as real and the latter as personal property.

The first constitutional convention, which met in 1863, framed a constitution which provided for the taxation of all property, including in terms "mines and mining property." This was rejected by the people. The present constitution was framed in 1864, and article 10 provides for the taxation of all property, "real, personal, and possessory, excepting mines and mining claims." The convention of 1864 took the rejected constitution of 1863 as the basis for a new one, and proceeded to alter and amend it; the most important amendment being in article 10. The change is significant. The constitution of 1863 provided for a tax on mines and mining property; that of 1864 excepts "mines and mining claims" from taxation, providing for a tax on the proceeds alone. Why this change of the words "mining property" to "mining claim?" The debates in the convention show quite clearly. It is evident the members had in their minds that distinction between mines and mining property, or improvements, which appears in the previous territorial legislation, and intended by the language used, an exemption of the body of the mining ground only, leaving the proceeds, whenever a mine yielded any, and the mills, hoisting works, engines, and other "mining property," still subject to taxation. A few quotations from the debates will make this apparent. Mr. Banks said that "not only in California, but in this constitution, framed by the former convention, which we have adopted as our basis, there has always been a distinction made between mines and mining property. I propose to preserve that distinction. * * * Mining property is considered to embrace all the improvements on mines, and that is included with and taxed as other property is taxed. Mills, hoisting houses, and all the other property connected with mining operations, which is distinct from the mine itself, have been taxed as mining property. * * * If the members of the former convention had not clearly recognized that distinction they would not have used the two sets of words but would have said 'mining property' alone or 'mines' alone." Con. Debates, p. 224. And he goes on to show why the mines should not be taxed. This position taken by Mr. Banks is nowhere questioned throughout the discussion of article 10. Wherever any allusion is made to the matter, it is such as to show that there was no objection on the part of the mining interest to taxation of improvements on mines.

Mr. DeLong, an ardent advocate of the mining interest, at one time said that for the sake of compromising he was willing to abandon the position he had at heart: "that nothing but the proceeds and improvements of mines and not the mines themselves should be taxed," etc. Debates, p. 321. Again he says: "I believe they (the mines)

are not such property as should be included in taxation beyond the proceeds and the improvements." .Id. p. 322. Again: "We are willing to pay on everything that is in sight, or that we know we have got. You may tax every dollar taken from the mines and every building erected upon them; and when you have gone that far we think you have gone far enough." Id. p. 336. See, also, Id. pp. 339, 418.

Throughout the whole discussion of article 10, which was quite general and lasted several days, there does not appear to have been any question raised about the propriety of taxing mills, hoisting works, and all other surface improvements of mines and mining claims. This seems to have been conceded on all sides; it could not justly have been otherwise. There would have been no fairness in exempting from taxation such mining property, having, as it did, a value as easily ascertainable as that of farming property. The contest between the farmers and miners was in reference to taxing the mines considered as a thing distinct from all other property. The miners, with much show of reason, objected to a tax upon the mine, because until proceeds came out of it its value was wholly prospective and uncertain. This was the whole extent of the discrimination asked in their favor. They were willing at all times to be taxed on the proceeds and surface improvements of their mines.

Doubtless very great importance should not be attached to individual expressions of members of the convention, but they may be considered in connection with other surrounding circumstances, and may help to make clear the sense of the words "mines and mining claims" as used in the constitution. When, however, it appears that the words were universally understood by the members in a particular sense, it is difficult to resist the conclusion that the words were used in that sense, although capable of use in another.

The practical construction placed upon article 10, since the adoption of the constitution, has been to preserve the distinction between mining claims and the surface improvements thereon. The first state legislature, using the words of the constitution, exempted "mines and mining claims" from taxation, and under this law the improvements on such claims have ever since been taxed. The evidence in favor of that construction which distinguishes the mine from the improvements on it, consists in the distinction which existed before the making of the constitution, agreeably to which the mine was not, and the improvements were, taxed; the debates in the convention showing the sense in which the words were generally understood by the members; and, lastly, the practical construction placed upon the words from the time of the first state legislature until now. Upon this evidence we think the words "mines and mining claims," as used in the constitution, do not include anything more than the body of the mine or claim itself, and that the hoisting works, engines, and other surface improvements, are subject, like other property, to taxation.

Secondly: The defendant claims the tax to be illegal because the property taxed though within the chartered limits of the town is not within its actual limits; and the defendant, not deriving any benefit from the town government, the tax amounts to a taking of private property for a public use without just compensation.

The testimony shows that the premises taxed have been surveyed into blocks and town lots, and so designated on the town map; that the town had built no roads to defendant's works; that no aid, or aid of a very doubtful kind, could be given in case of fire by the town fire department; and in the opinion of most of the witnesses the defendant derived no benefit from being included in the town limits. The defendant does not question the power of the legislature to establish public corporations for public and municipal purposes, and define their limits; nor to confer on them power to tax property within the corporate limits in general; nor is the town ordinance, passed in pursuance of the charter of the town of Gold Hill, attacked as an illegal exercise of the town's power to tax as a whole. The argument is, that it is proper to inquire whether the defendant is or is not benefited by the town government; and if not, the tax, so far as concerns the defendant, is illegal, as a taking of private property without compensation. Cases from Kentucky, Iowa, and Nebraska, are cited in support of this argument. In Kentucky, where one having thirty-one acres of agricultural or horticultural land objected to paying a city tax, it was held that where the object was to give the border population a "local government and the benefit of police regulations" the tax was valid. The court said, however, that it would have been otherwise if the object had been to tax the property merely in order to increase the city revenues and lessen the burdens of others. Arbegust v. Louisville, 2 Bush, 271; Swift v. Newport, 7 Bush, 37.

The case of Bradshaw v. City of Omaha, 1 Neb. 16, arose on a demurrer to the complaint. The allegation, which must have been admitted by the demurrer, was that the plaintiff's land was two miles from the settled part of the city and one mile from any town lots settled or occupied as such; that the act extending the city boundaries "was passed for the sole purpose of subjecting the lands to the burdens of city taxation and to reduce the taxation on property previously within its limits." It was held that the act extending the city limits to embrace these agricultural lands was unconstitutional and void, as taking private property without compensation. The charter limits of the plaintiff are the same now as when first established in 1862. So in Iowa it has been held that lands, within the corporate limits

used exclusively for agricultural purposes, and not benefited by the current expenditures, are not subject to city taxation. The circumstances show, says the court, that the lands of the plaintiff are sought to be brought within the jurisdiction of the city, solely for the purpose of increasing its revenue, thereby taxing these lands for the benefit of others owning property in the city. Deiman v. Ft. Madison, 30 Iowa, 542.

To bring the present case within the principle of these decisions it will be necessary to find that the legislature of 1862 included the defendant's property within the town boundaries solely for the purpose of increasing the town's revenue, thereby to lessen the burdens of those who inhabited the more settled parts of the town, and not intending to establish a local government for the benefit of all. Unless the fact, if it be a fact, that the defendant is not now benefited by the town proves this, it has not been done.

In Georgia the taxation of agricultural lands within corporate limits is held to be a question for the legislature and not for the courts; that when the law-making power, acting within the scope of its delegated authority, has seen fit to tax such lands, the courts cannot interfere; they can only execute and enforce the law, not make a new one. Linton v. Mayor, etc., of Athens, 53 Ga. 588. Cooley says of the Kentucky, Iowa, and Nebraska decisions, that it seems difficult to harmonize them with the conceded principles governing the law of taxation. "For, 1. They do not question legislation as being in excess of legislative authority, as might be done where taxes are voted for a purpose not public, but they leave the legislation to stand, and only qualify its effects on the ground that it has been adopted on improper grounds and will operate unequally. 2. This is done on an inquiry into the facts and a substitution of the judicial conclusion for the legislative on a subject not at all judicial; a subject, too—the proper limits of city extension—upon which persons are certain to differ widely." Cooley, Tax'n, 120.

The only restrictions on the power of the state of Nevada to tax property within its jurisdiction, and direct the purposes for which taxes shall be raised, are that the assessments shall be uniform and equal and the purpose a public one; with this qualification the extent of taxation is a question for the legislature—it may be carried as far as that body chooses to carry it. The only protection against abuse lies in the fact that the taxpayers are the constituents of those who levy the tax. Gibson v. Mason, 5 Nev. 283, 306. So long as the legislature acts within these conceded powers the courts may

not interfere. "The judicial cannot prescribe to the legislative department of the government limitations upon the exercise of its acknowledged powers. The power to tax may be exercised oppressively upon persons, but the responsibility of the legislature is not to the courts but to the people by whom its members are elected." Veazie Bank v. Fenno, 8 Wall. [75 U. S.] 533.

The town of Gold Hill is a public corporation created by the legislature for political purposes. It has conferred upon it, by the legislature, a power of taxation. This power extends to all property real and personal within the town "made taxable by the laws of this state for state and county purposes." Given, then, the power of the legislature to establish a municipal corporation and to confer upon it a portion of the legislative power of the state, I cannot see any ground upon which the court can interpose to defeat the legislative will in this case, that will not justify it in substituting its own opinion as to the justice, policy, and expediency of any other law conceded to be within the power of the legislature to enact.

It might not be difficult to distinguish this case from those cited by defendant in some important features. For instance, the property here has been laid off into blocks and lots, and these are numbered on the town map, tending to show that the property is needed for town purposes. The works are within fifteen hundred feet of a fire-plug, and it would be quite possible to lay down that much hose in case of fire. The defendant, too, may be regarded as receiving benefit from the schools, to the support of which a part of the tax is devoted, and from the good order secured by the incorporation of the inhabitants into a town. But it seems to me altogether improper for a court to make inquiry in regard to the benefit the citizen receives from a tax; or into the motive of the legislature in levying the tax; or into the propriety of that body exercising a conceded power in a given way. Such inquiries are very fit for the legislator and very unfit for the judge.

But one point remains. It is admitted that lot 39 and the south two hundred and ten feet of lot 20 are a portion of the surface-ground of the defendant's mining claim. The surface-ground taken up as part of a mining claim is clearly included in the words "mines and mining claims" as used in the constitution; and while the improvements erected thereon may be taxed, such surface-ground cannot. There must be judgment in favor of plaintiff as prayed, less the tax levied on this surface-ground, which is twelve dollars and a half.